Hey, police, court, good morning, your honors. My name is Bruce Berline. I represent Khajurdor Semikian. I would like to try and reserve three minutes on rebuttal. When I first started looking at the trial transcripts and reading them through on this matter, one thing, one conclusion that I reached was that Mr. Semikian was denied a fundamentally fair trial. And he was denied that through many instances of prostitutorial misconduct in a very limited amount of time. It doesn't matter how you analyze it. Were you vouching? Was I vouching? No, your honor, I never vouched. It seemed to me that was a pretty good vouch. You can analyze it either way. You can take it one issue at a time or what we were advocating is the cumulative error doctrine. I think this case is well suited for the cumulative error doctrine. If you have cumulative error with unpreserved non-constitutional issues, then it's plain error. If you have preserved the non-constitutional errors, then it's reversal of conviction is warranted if the court is persuaded that it's more probable than not that the prosecutor's misconduct material affected the verdict. But if you have, under the cumulative error doctrine, if you have a preserved constitutional issue, which we do, then there should be a higher standard. And that standard I don't think has been clearly set forth in this circuit. But in United States v., and I'm going to butcher this name, but Nokercha, this court alluded to a higher standard. The errors in that case were all plain, were all plain errors. So it was under the plain error standard. But for some reason, the panel cited to a Tenth Circuit case, U.S. v. Rivera, and put set forth the standard for constitutional errors. And that was reversal is required unless it is shown that the error was harmless beyond a reasonable doubt standard. And if you look at U.S. v. Rivera, they say, well, the reason we want to do this is we want to provide all the protections against such constitutional error that the U.S. Supreme Court has given and those bodies. So it doesn't matter which way you do it. Either way, I think the conclusion is it's a fundamentally unfair trial. But our position is that all this should be looked at under the cumulative error doctrine and under this heightened standard. The one. What do you think is the most serious error? The most serious error? Yes. I think actually there's three, but the most serious. Well, three then. The three most serious.  Quickly, the one thing is the burden shifting. The burden shifting at the rebuttal closing of the prosecutor's argument. He comes in. He says, look, if Nasrallah is so important as they claim, then why didn't they bring him here? There was an objection. There was an immediate. There was no ruling by the judge, no ruling on the objection. And the judge gave a jury instruction that said, look, arguments of counsel at closing are not evidence. What then happened to the jury is there was not a proper curative instruction and there was no ruling on defense counsel's objection. So in essence, the judge ratified that statement to the jury. Smith didn't testify, right? He didn't. He absolutely didn't. And he came up with a, I guess, I don't know, but it's alleged that he came up with sort of a new defense at trial. That's right. Right. And the reason, it's an excellent observation, because what happened, Your Honor, the prosecutor, even though in his opening statement said, look, the two victims here are Astor Bebehani and Nasrallah Bebehani, and we have brought to you Astor and Sandra Mark. Well, where's Nasrallah? The prosecutor admitted to the judge that he had never spoke to him and, of course, never called him as a witness. So, of course, he was surprised when the defense case in chief comes up and suddenly there's a plausible explanation for where this money went. And the plausible explanation is, well, I had a deal with Nasrallah to run all these companies on his behalf in the CNMI, and he promised me a minimum of $50,000 a year. So suddenly, you can see it in the transcript, the prosecutor becomes panicked. He says, well, where does this come from? And then suddenly that's where all the misconduct started. The most serious, I think, was the burden shifting. Well, before you go on, well, sorry, I'll let you go. No, no, go ahead. What I was saying, what I was commenting or thinking about here, you're really suggesting that the defendant takes the witness stand, he can be cross-examined on the witness stand, he can be assailed like any other person on the witness stand, and his story has a person who he doesn't call and doesn't bring to the courtroom to confirm. And you're suggesting that, then it is misconduct to suggest that, because he doesn't call that friend to come to court and corroborate his story, but that's somehow putting him in jeopardy. Isn't that Cabrera? And doesn't Cabrera say, right on point, that is not necessary? To some extent, that is U.S. v. Cabrera, Your Honor. That's right on point. No, it's not. Cabrera is easily distinguished. What we have here is a prosecutor telling a jury, look, where is Nasrallah? Well, but that's what they did in Cabrera. That's right. Where's the witness? Where's the friend that could have come to court to corroborate this story but didn't come? Absolutely. But the big difference there between our case and the Cabrera case is our prosecutor knew that Nasrallah was out of the subpoena powers of the federal district court and he had never, ever spoken to him. Well, so what? He doesn't have to talk to every witness. No, that's true. But if he doesn't talk, then he better not be misleading the jury and saying, hey, through implication, of course, but still just as powerful to say, hey. What is the case that says that any attorney must visit with every witness that there is, including witnesses that could be pro or con on his side, and thereafter not having visited with them, say, well, if you really say that's the story, why didn't you bring it in here? What case says that? Can't cite you a case, Your Honor. But what I can do is factually distinguish Cabrera. Cabrera had many safeguards. When that prosecutor said, hey, where is this person? He immediately told the jury, I have the burden, and took. Well, so did they hear. The defendants and the prosecutor said, the defendant has no obligation to put on a case. The burden is entirely mine and the government's. I have to prove every single element to you, and it's prerogative to sit there and say nothing. It's still my job. He doesn't need to tell you, convince you of anything, but it's also his decision to take the stand and tell you a story. And if he's going to tell you a story, you've got to decide whether it's true or not. Absolutely. But I don't think that his curative instruction was appropriate under, I think, USPT, Perlaza, where they went, and Cabrera, where they said, look, he took great pains to say, my burden. I don't think that instruction that the prosecutor gave to the jury. He didn't give any instruction. He just said, ladies and gentlemen, I'm responsible. But now he's taking the stand to purge his case. All right, go to the second one, which I think is important. My good colleague has to go. The second thing, it's like a second tier. When he talked to, let me back up, the burden shifting, but there were other comments of the same thing. They just weren't preserved. He was always constantly saying, but where's Nesrala? Where's Nesrala? Okay, the burden shifting, that one thing is important because it was preserved constitutional issue, burden shifting. We've got that. Okay, so there's more. And dovetailed with that is several comments he made about Astor being present in the court. Okay, that does a couple things. He says, well, Astor's here, so she must be telling the truth because she's concerned that it's her money. That's not part of the record, and that's absolute voucher. Frankly, that's your best argument about that. I have been in your situation before in trial, and my response is my witnesses are here, and they're telling your story, and you can evaluate it. They don't bring theirs. That is not unconstitutional. No, but when it's asserting the prosecutor's opinion into the record, as that prosecutor did, and because that wasn't part of the record, he was specifically pointing to Astor and asking the jury, look, she's more credible because she's sitting here and she's paying attention. But there's another level to that also, Your Honor. At the same time, he goes, but Nesrala's not here. Okay, and he knows Nesrala is not within the subpoena powers of the court. He's misleading the jury. What he should have said is he's not here because nobody can subpoena him, but instead he lets that implication clear his day out to the jury and say, I want them to believe that he's not here because he's not coming because he would have something disfavorable to say. That is misleading to a jury. And so that is brilliant, actually, because that dovetails wonderfully with the Astor comments, dovetails wonderfully with where's Nesrala. You know, before your time completely runs out, I do want to ask you one thing about sentencing. You had a couple of sentencing issues. Not the disproportionate standard that was alleged. Put that aside for a moment. But he was – two levels were imposed for obstruction of justice in the way – because supposedly – or not supposedly – Mr. Samikian told his probation officer that he had posted bail when, in fact, he hadn't. Yes. And what I didn't understand from the briefing, from the record here, is what role did the probation officer play in determining whether or not – was it part of his obligation in CMI? You know, I didn't quite figure out how that all came about. You know, I wasn't a trial attorney, so I don't have that kind of knowledge. But – and I only had the transcripts as court. Yeah, so it – I'm not really sure how it came up. The judge denied the – So let me ask you this. Okay. Can you tell from the record – you know, at the time of trial, was Samikian in custody? No. No, he wasn't. So he's convicted, and the judge must have said, well, you know, I'm going to remand you to custody. He's convicted. He gets remanded. That's correct. Okay, and Samikian says he wants out by posting bail? No. I'm sorry. He was convicted. He was allowed to go to court. He was convicted. He had to post a bond. He had to post a bond. It was, I think, a $300,000 bond, which was pretty difficult. I think it was double from what he had to post pre-conviction. So – and somehow there was – and I think you can see it in the trial transcripts – is a discussion that his attorney said, well, he had his trouble, and he kept calling in, and suddenly that argument turned into, well, it's a misleading material statement to a probation officer, and therefore it's obstruction of justice. And that's really the only way I know that there was not a lot of discussion about it. I'm sorry. But it wasn't part of the – it wasn't – well, usually it's the pretrial services that deals with bonds and whatnot. Yeah, and that's what happens here. I mean, we don't have a real elaborate pretrial services. We have one or two people. But I'm not – I don't feel I'm answering your question. I apologize. Well, it got two points. Okay. It did get two points. He's got a two-point enhancement for that. I did not get that bond. And the judge said, well, that is a material misrepresentation. And, frankly, there was no evidence in the record of that being a material misrepresentation, and I don't think it fits the evidence on the sentencing guidelines, and I don't think it's – The government's brief is a little bit cryptic. Yeah. I would like to reserve. Okay. You have a minute or so. Thank you. Thank you. We'll hear from the government. May it please the Court. Eric O'Malley on behalf of the government. The defendant in this case is alleging a string of errors that cumulatively prejudiced the trial. The government suggests that most, if not all, of those were not errors at all. To address the shifting of the burden point, Cabrera is written in a very deliberate fashion. In the operative quote, which I will just quote verbatim, a prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof and is therefore permissible so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on a failure to testify, period. Cabrera then cites two other cases and then, after citing the other two cases, notes that in Cabrera the defendant took the stand so his Fifth Amendment rights were not implicated. The same situation applies here. It then says, furthermore, there were all these curative instructions. I suggest that that was very carefully drafted to say this is the law. A comment on a defendant's failure to call a witness does not shift the burden, period. It would have been very easy for the Cabrera court to say, does not shift the burden provided that there is a curative instruction, but it did not do that. Am I correct in thinking that he was available to testify by phone? There were attempts to arrange testimony from Kuwait. It takes about two days at least to travel to Saipan. There were attempts to have him testify. It was the prosecutor, and I think that this is important, it was the prosecutor that was trying to call him in as a rebuttal witness, and it was the defense counsel that was both objecting to delaying the trial so he could travel. He was objecting to having a teleconference. He was objecting to even doing it telephonically, alleging the Sixth Amendment rights of the defendant. And so this was all going on behind the scenes outside of the earshot of the jurors, but I think it, for me at least, gives the impression that this is a story that was raised by the defendant. At the same time, he actively tried to prevent the government from rebutting, and the obvious question is why would he do that? There are several, the counsel of the defendant for the appellant suggests on several occasions that there is something improper with implying that the defendant was dishonest or was lying, and I submit to you it was a fraud trial. If the government can't prove that there was some dishonesty in the theft of $250,000, then it shouldn't be bringing the case. Going back to the specific point of shifting the burden, even if the court disagrees and says that there must be some curative instruction, as Your Honor, Judge Smith pointed out, there were curative instructions here. In his opening statement, the prosecutor said that the government has a burden to prove each element. Immediately after the court's instruction that what the counsel says is not evidence, as you quoted, the prosecutor did give curative instruction, and it was pretty detailed. And then moments, just moments after that, the court gave its instructions to the jurors that included both a description of the burden of proof, the standards for reasonable doubt, and as well as an explanation of the presumption of innocence. Now, as to the defendant's vouching argument, that pretty much relies on this whole Cabrera argument that it was impermissible to comment on the defendant's purportedly helpful witness in his absence. And we would submit that because it is permissible, as the Cabrera court holds, that there was no vouching and that it was perfectly legitimate to suggest that because the government witness that did testify was there, that she did have a vested interest. And I think that the jury can make that reasonable inference based on the record. I would like to speak just a few moments about the Doyle error, which I expect was probably the third point that counsel never specifically addressed. The two questions with the Doyle error is, first of all, was there a Doyle error at all? And second, if there was a Doyle error, was it harmless? I would submit that the answer to the first question is no, there was no Doyle error. But even if the court disagrees, that error was harmless in the context of the whole trial, given the weight of the evidence against the defendant. Speaking specifically to a Doyle error and what is a Doyle error, to begin, of course, a prosecutor can draw an inference or make an inference based on a defendant's silence to impeach his testimony, as long as it doesn't impugn on the defendant's assertion of his Fifth Amendment rights. And this makes sense because it would give an unfair advantage to us prosecutors to encourage someone to assert their Fifth Amendment privilege of silence and then turn around and say, in an instance where most innocent people would be expected, a jury would expect them to be most adamant about explaining themselves, we're encouraging them not to say anything. And it would be unfair for us prosecutors to get up there and say, the most strongest instinct for an innocent person to exonerate themselves would be when you're read your rights, there's a little bit of pressure when you're first confronted by authority, even a little bit more pressure when you're arrested, but the most pressure after you've been read your rights, a juror would expect a truly innocent person to say, I waive my rights and I would like to explain myself. But we allow that it might be unfair because even in today's world where you see television and you talk to lawyers and they're like, if you get arrested, don't say anything until you talk to a lawyer. It would be unfair for a prosecutor to take advantage of that and perhaps even the ultimate end run result would be that an innocent person could end up in jail. So all this makes sense. But in this case, and in the cases that have addressed the Doyle Air before, and Lopez I think is the closest case on point, there was some emphasis on either being approached by authorities or being arrested. There was discussion about both pre and post Miranda statements. In this case, we have just a very, very open-ended, never said anything to anyone. There is no emphasis on either being approached by authorities. There is no emphasis on discussions during an arrest or being questioned at a police station or most especially anything post Miranda. There was no emphasis on anything. And we would snit that the Seventh Circuit's rule in Baylor was a sound one and a wise one because to adopt the defendant's position would essentially create a third rail that us prosecutors must, if there's one phrase that we have to avoid in every trial is never say you never told anyone anything. And I think that that's just a little bit too much. In the broad scope of things, the grand scale of time to say that you never told anyone anything and assert that that is an implication or an impunation of, I'm not sure if impunation is a word, but an implication of the defendant's Fifth Amendment post Miranda assertion of the Fifth Amendment rights is just a little bit too attenuated. That said, if this Court disagrees and says that such global statements do implicate the Fifth Amendment, the period post Miranda, I would snit that in this case it was harmless error because there really was quite a bit of evidence against the defendant. Most notably, what I would suggest amounts to essentially a confession. When he took the stand, he said something to the effect of when I didn't get paid for a couple of years, I justified taking the money. In my book, that's a confession. And that's on top of all the other documentary evidence and testimonial evidence that the government introduced. At that point, pretty much as the defense briefs acknowledged, their only potential defense was this explanation, this based on hearsay of this witness that the defendant raised. It was the defendant that said that Nasrallah could help me out. That was all he had. That was the only defense that he could have raised. And I think based on especially the rebuttal witnesses, a jury was certainly justified in discrediting his own testimony and saying that his story was a bunch of hockey. I'm interested in the obstruction of justice enhancement. Yes, Your Honor. Because my colleague talked about it and I'm interested in it. Do you know how this $100,000 from Outstanding Balance came about? I couldn't find it in the record. I think probably the – I wasn't the trial attorney on it as well, and so we're kind of operating a little bit in the dark. But my understanding, in general, the counsel for the appellant did have the facts right. Okay. He was – So the facts are right. Right. So my understanding is that enhancements must be based on willful conduct that has the purpose of obstructing the justice. Would you agree? I would agree, Your Honor. And the court must make factual findings that – to be used by the preponderance of the evidence. That's what U.S. v. Dares says. Yes, Your Honor. And yet I didn't find any factual findings here of willful conduct. I was – In this record. In even the record, the written record of what took place at the sentencing. Right. They talked about a lot of different things, and this was but one of many. And perhaps the record is deficient in that – on that very narrow issue. So it's on appeal. Can I affirm that? I would submit that you may affirm that based on even the standard as issued. So I have to go through the record and determine if there was willful conduct myself on appeal, since the district court didn't say anything about it? Given that – Is that what I do? Given you can, I think that you have that right. And there is, I think, the standard of review that has to be applied first. And there should be a certain amount of deference given to the decision of the district court. But we don't know what it was. Well, we don't know what the district court determined. Arguably so. I would submit that it's not necessary, however, to send the defendant back to Saipan all the way for resentencing based on what is essentially going to be reintroduction of the same facts or evidence. How do we know that? How do we know that there's no point in it because we know what it would be based on if the court didn't tell us what it was based on? Well, I think that the district court can be given an opportunity to clarify his own record based on his discussions with the probation officer and what it's existing on. See, I'm not even sure what, if the materiality requirement is actually satisfied here because it's information that supposedly was given to the probation officer. I don't quite understand how the probation officer, why that was material, what the probation officer was. Did he have an obligation to investigate that? My understanding is that at some point there was, the defendant made a request to be released pending his sentencing. The probation officer in Saipan, we have probation officers serve several functions. Does he serve as a pretrial officer as well? Yes. She does? Yes.  There was this requirement that the defendant, the appellant, post the bond. He informed her that the bond had indeed been posted when in fact it had not. And that is where the material misstatement comes from. And I believe that that, at the very least, is in the record. That is in the record. Did counsel ever dispute those facts in the record? I believe he disputed not necessarily those facts, but that his argument was that the appellant was mistaken. Did he ever dispute that the bond was never posted? To my recollection, he never disputed that the bond was not posted. Is this a harmless error because the sentence was at the lower end of the range? I would submit that it is. I anticipate and I can only speculate what is going to happen, but the government is going to spend, if he gets re-sentenced, is going to spend tens of thousands of dollars to have him re-sent back to Saipan where he is going to receive pretty much the exact same sentence, perhaps with a slightly more developed record. But I anticipate that that is what is going to happen. Firstly, it couldn't be harmless if he was sentenced outside the range and above the range. I'm not willing to concede that at this point, but I think that given that he was sentenced at the lower end of the range, in any case, it would be harmless. Okay. Those are my questions. Thank you very much, sir. Any further questions? Thank you. Quickly, with the Doyle error, I don't think it is very difficult just to not say you never told anyone anything. Stay away from it. There were seven, no less than seven Doyle errors in this case, all at the end, four in rebuttal closing. Most of these things were in rebuttal closing where there was no opportunity or chance of cure by the defendants. There wasn't by the judge and there wasn't by the prosecutor. Judge Smith, I'm going to come back to Cabrera. Prosecutorial misconduct is by and far a fact-based animal. You've got to look at the context of the prosecutorial misconduct. You've got to look at the facts. That's why there's no black letter law and U.S. v. Parlaga tells us that. So if you look at these facts and the impact that it had on the verdict, even looking at the verdict, he was found guilty of count one and not guilty of count two and count three. This was a common scheme arising out and these three wires came out of this common scheme. The first two, one and two, were both from cuff springs. One was to buy a house and the second, $100,000, was to renovate the house. And they were all based on, basically, Aster Devahani and this woman, Sandra Mark, who ran the companies in Liechtenstein. They were Switzerland companies. So something happened. Something happened because the verdicts don't make sense. And I'm not saying there's anything wrong with that in the normal case, but when you have this amount of prosecutorial misconduct in this short a time and most of it in rebuttal without any kind of opportunity to try and cure, then something has gone wrong and there has been effect. Thank you. Thank you. Thank you. If that will dispard you to submit it for decision, we'll hear the next case, which is United States v. Zaragoza.
judges: Schroeder, Paez, Smith